Opinion issued September 15, 2005


















In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-03-00899-CV
__________
 
LAIRD DOCTOR AND LINDA DOCTOR, Appellants
 
V.
 
HOWARD E. PARDUE AND EXPERIMENTAL AIRCRAFT
ASSOCIATION, INC., Appellees
 

 
 
On Appeal from the 113th District Court
Harris County, Texas
Trial Court Cause No. 1999-52227
 

 
 
O P I N I O N
          Appellants, Laird Doctor (“Lad”) and Linda Doctor, challenge the trial court’s
judgment entered after a jury trial in their negligence suit against appellees,
Experimental Aircraft Association, Inc. (“EAA”) and Howard Pardue, for personal
injuries that Lad sustained in an airplane collision that occurred in Wisconsin. The
Doctors present six issues for our review, seeking a reversal of the trial court’s
judgment, which ordered that they recover $500,000 from EAA and take nothing
from Pardue. The Doctors contend that the trial court erred in concluding that Texas
was the state with the most significant relationship to the issue of charitable immunity
and in applying the Texas Charitable Immunity and Liability Act (the “Act”)


 to limit
their award against EAA and to completely immunize Pardue. The Doctors also
contend that the evidence is factually insufficient to support the jury’s findings of
zero damages for Lad’s past and future physical pain and mental anguish, past and
future disfigurement, and past and future physical impairment; zero damages for
Lad’s past medical expenses; $2.5 million in damages for Lad’s future medical
expenses; zero damages for Linda’s past loss of consortium; and $50,000 for Linda’s
future loss of consortium. 
          We reverse and remand for a new trial.
Factual and Procedural Background
          EAA, a not-for-profit charitable corporation incorporated under the laws of
Wisconsin, maintains its principal place of business in Wisconsin. Although it is not
registered to do business in Texas, EAA is subject to the general jurisdiction of Texas
courts.


 EAA is an organization dedicated to preserving the grassroots aspect of
aviation and encouraging families and children to become interested in aviation. It
assists governmental agencies in the development of aviation activities and promotes
and encourages aviation safety, aviation research and development, and non-commercial aviation. Every year, EAA hosts a convention and sponsors an air show,
known as “AirVenture,” in Oshkosh, Wisconsin.
          In July 1999, Lad was rendered a quadriplegic at the air show when the vintage
World War II Corsair aircraft that he was piloting collided on the runway with
another aircraft piloted by Pardue. At the time of the collision, Lad was working as
a professional pilot and an employee of the Corsair’s owner, the Cavanaugh Flight
Museum (“CFM”), located in Addison, Texas. Pardue was piloting an aircraft owned
by the Breckenridge Air Museum (“BAM”), a charitable organization located in
Breckenridge, Texas, and he was serving as a BAM volunteer. Lad and Pardue, both
Texas residents, attended the air show in Wisconsin to exhibit the aircrafts on behalf
of their respective organizations.
          The Doctors sued EAA and Pardue for negligence, seeking damages “under the
laws of the State of Texas.” EAA filed a motion for partial summary judgment
seeking a ruling that, based on the Act, its liability to the Doctors was limited to
$500,000. Pardue also filed a motion for partial summary judgment seeking a ruling
that, based on the Act, as a volunteer he was entitled to absolute immunity from
liability for the Doctors’ injuries. The Doctors then filed an amended petition
asserting that Wisconsin law should govern the issue of charitable immunity. EAA
and Pardue also filed pretrial motions for determination of applicable law, arguing
that Texas law should govern and that the Act should apply. The trial court carried
these motions through trial.
          The jury, finding that the negligence of EAA, Pardue, and Lad proximately
caused the collision, attributed 25% of the negligence to EAA, 25% of the negligence
to Pardue, and 50% of the negligence to Lad. The jury awarded zero damages for
Lad’s past and future physical pain and mental anguish, past and future
disfigurement, past and future physical impairment, and past medical expenses; $2.5
million in damages for Lad’s future medical expenses; zero damages for Linda’s past
loss of consortium; and $50,000 for Linda’s future loss of consortium. The jury
further found that, at the time of the collision, EAA was a charitable organization and
that Pardue was acting in good faith and in the course and scope of his duties and
functions as a volunteer of a charitable organization. Based on these findings, the
trial court applied the limitations set forth in the Act and rendered final judgment that
the Doctors recover $500,000 from EAA and take nothing from Pardue.
Choice of Law
          In their fifth issue, the Doctors argue that the trial court erred in applying the
Act to limit EAA’s liability because Wisconsin had the most significant relationship
to the charitable immunity issue as EAA


 is a Wisconsin organization, the acts and
omissions underlying the jury’s negligence finding occurred in Wisconsin, and the
crash and resultant injury occurred in Wisconsin. The Doctors also argue that if the
trial court’s application of the Act is affirmed by this Court, Texas corporations will
lose the protections provided under the Act when sued in foreign states by foreign
plaintiffs, even for injuries arising out of charitable services performed in Texas.
          The determination of which state’s law applies is a question for the court. 
Torrington Co. v. Stutzman, 46 S.W.3d 829, 848 (Tex. 2000). Therefore, we must
review the trial court’s decision to apply Texas law to this case de novo. Minn.
Mining & Mfg. Co. v. Nishika Ltd., 955 S.W.2d 853, 856 (Tex. 1996); Tracker
Marine, L.P. v. Ogle, 108 S.W.3d 349, 352 (Tex. App.—Houston [14th Dist.] 2003,
no pet.). Texas courts use the “most significant relationship” test to decide choice of
law issues. Torrington Co., 46 S.W.3d at 848; Hughes Wood Prods., Inc. v. Wagner,
18 S.W.3d 202, 205 (Tex. 2000); see also Restatement (Second) of Conflict of
Laws §§ 6, 145 (1971). Under that test, a court must consider which state’s law has
the most significant relationship “to the particular substantive issue to be resolved.”
Hughes Wood Prods., Inc., 18 S.W.3d at 205. 
          EAA argues that the trial court correctly applied the Act to reduce the jury’s
damages award to $500,000 because Texas is the state with the most significant
relationship “to the discrete issue of the amount of compensatory damages”
recoverable by the Doctors. EAA asserts that Texas has an overriding interest in
reducing the liability exposure and limiting compensatory damage awards against
charitable organizations, including those not incorporated in Texas, like EAA. In
support of its argument, EAA relies on Torrington, in which the plaintiffs argued in
favor of application of Texas law on damages, while the defendants argued for
application of Michigan law, which did not permit recovery of mental anguish
damages, or Nebraska law, which only permitted recovery for pecuniary losses. 46
S.W.3d at 848 n.16. 
          However, the issue here, unlike the issue presented to the court in Torrington,
does not directly relate to the type of damages recoverable by plaintiffs, but instead
relates to protections afforded to a certain class of defendants—charities and
volunteers, for a certain type of conduct—performance of charitable services. We
note that the doctrine of charitable immunity has been treated as an affirmative
defense that must be pleaded and proven by parties seeking its application. See Tex.
Dep’t of Transp. v. Jones, 8 S.W.3d 636, 638 (Tex. 1999) (stating that immunity from
liability, like other defenses to liability, must be pleaded and proven and can be
waived); Shoemake v. Fogel, Ltd., 826 S.W.2d 933, 939 (Tex. 1992) (stating that
governmental immunity and charitable immunity can be waived by failure to assert
them as affirmative defenses) (citing Davis v. City of San Antonio, 752 S.W.2d 518,
520 (Tex. 1988)). The central issue disputed by the parties in this case, distinct from
the issue in Torrington, is whether the trial court properly limited the liability of EAA
and completely immunized Pardue pursuant to the provisions of the Texas Charitable
Immunity and Liability Act. We thus hold that the underlying particular substantive
issue presented to this court is one of “charitable immunity.”


 
          Accordingly, we now consider, under the most significant relationship test,
whether the law of Wisconsin or Texas should apply. We begin our choice of law
analysis by consulting section 168 of the Restatement of Conflict of Laws, which
specifically addresses charitable immunity. Restatement (Second) of Conflict
of Laws § 168 (1971); see also Hughes Wood Prods., Inc., 18 S.W.3d at 206 n.2
(stating that “[this] Court has often applied more specific sections of the Restatement
to address particular choice of law issues”); Robertson v. Estate of McKnight, 609
S.W.2d 534, 536 (Tex. 1980) (applying section 169 of Restatement to determine
choice of law on issue of interspousal tort immunity). Section 168 provides that the
law selected by application of section 145 of the Restatement determines the issue of
charitable immunity. Restatement (Second) of Conflict of Laws § 168. The
comments to section 168 further provide that the determination of the applicable law
should be made in light of the principles set forth in section 6. Restatement
(Second) of Conflict of Laws § 168 cmt. b. 
          Section 6 sets out the following factors relevant in a choice of law analysis:
          (a)     the needs of the interstate and international systems,
          (b)     the relevant policies of the forum,
          (c)     the relevant policies of the other interested states and the relative
interests of those states in determination of the particular issue,
 
          (d)     the protection of justified expectations,
 
          (e)     the basic policies underlying the particular field of law,
 
          (f)      certainty, predictability, and uniformity of result, and
 
          (g)     ease in the determination and application of the law to be applied.
 
Restatement (Second) of Conflict of Laws § 6(2); see also Hughes Wood
Prods., Inc., 18 S.W.3d at 205. In tort actions, the needs of interstate and
international systems, the relevant policies of the forum, the relevant policies of other
interested states, and the ease in the determination and application of the law to be
applied assume greater importance. Restatement (Second) of Conflict of Laws
§ 145 cmt. b.
          Section 145 states that the following contacts are to be taken into account when
applying the principles of section 6 to determine the law applicable to a particular
issue:
          (a)     the place where the injury occurred,
 
          (b)     the place where the conduct causing the injury occurred,
 
          (c)     the domicile, residence, nationality, place of incorporation and
place of business of the parties, and
 
          (d)     the place where the relationship, if any, between the parties is
centered.

Restatement (Second) of Conflict of Laws § 145(2) (1971). These contacts are
to be evaluated according to their relative importance with respect to the particular
issue. Id. Furthermore, the number of contacts with a state is not determinative. 
Torrington Co., 46 S.W.3d at 848. Rather, a court must evaluate the contacts in light
of the state policies underlying the particular substantive issue. Id. 
          The facts controlling the choice of law analysis here are largely undisputed. 
Lad’s injury occurred in Wisconsin, as did the conduct causing the injury. See
Experimental Aircraft Ass’n, Inc. v. Doctor, 76 S.W.3d 496, 504–05 (Tex.
App.—Houston [14th Dist.] 2002, no pet.) (agreeing with EAA’s contention that
there was no evidence to support finding of specific jurisdiction in this case). At the
time of the collision, although the Doctors and Pardue were Texas residents, EAA
was incorporated in Wisconsin and maintained its principal place of business in
Wisconsin. 
          In regard to the relevant policies of the forum, we note that Texas has abolished
the common-law doctrine of charitable immunity. Howle v. Camp Amon Carter, 470
S.W.2d 629, 630 (Tex. 1971); Sprague v. Mem’l Baptist Hosp. Sys., 580 S.W.2d 1,
2 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref’d n.r.e.). However, in 1987,
the Texas Legislature enacted the Texas Charitable Immunity and Liability Act,
limiting the liability of charitable organizations and immunizing volunteers who meet
certain conditions. Tex. Civ. Prac. & Rem. Code Ann. §§ 84.001–.008 (Vernon
Supp. 2004-2005).


 Specifically, in any civil action brought against a nonhospital
charitable organization for damages based on an act or omission by the organization
or its employees or volunteers, the liability of the organization is limited to a
maximum of $500,000 for each person and $1,000,000 for each single occurrence of
bodily injury or death. Tex. Civ. Prac. & Rem. Code Ann. § 84.006. The 
Legislature passed the Act with the following findings and purposes: 
(1)     robust, active, bona fide, and well-supported charitable
organizations are needed within Texas to perform essential and
needed services;
 
(2)     the willingness of volunteers to offer their services to these
organizations is deterred by the perception of personal liability
arising out of the services rendered to these organizations;
 
(3)     because of these concerns over personal liability, volunteers are
withdrawing from services in all capacities;
 
(4)     these same organizations have a further problem in obtaining and
affording liability insurance for the organization and its
employees and volunteers;
 
(5)     these problems combine to diminish the services being provided
to Texas and local communities because of higher costs and fewer
programs;
 
(6)     the citizens of this state have an overriding interest in the
continued and increased delivery of these services that must be
balanced with other policy considerations; and
 
(7)     because of the above conditions and policy considerations, it is
the purpose of this Act to reduce the liability exposure and
insurance costs of these organizations and their employees and
volunteers in order to encourage volunteer services and maximize
the resources devoted to delivering these services.

Tex. Civ. Prac. & Rem. Code Ann. § 84.002 (Vernon Supp. 2004-2005) (emphasis
added).         
          Like Texas, Wisconsin has also essentially eliminated common-law charitable
immunity. See Lewis v. Physicians Insur. Co. of Wisconsin, 627 N.W.2d 484, 492
(Wis. 2001) (noting that charitable immunity doctrine in Wisconsin is largely
defunct); Szarzynski v. YMCA, 517 N.W.2d 135, 141 (Wis. 1994) (citing Widell v.
Holy Trinity Catholic Church, 121 N.W.2d 249, 251 (Wis. 1963) (stating that
immunity for charitable and religious organizations has been eliminated by courts)). 
Wisconsin eliminated common-law charitable immunity on public policy grounds. 
In Widell, the Wisconsin Supreme Court stated:
When an institution owes a duty of care to another and, as a result
of carrying on its activities through agents whether the enterprise
or activity involves financial gain or not and no matter how lofty
the purpose or motive, injures another either directly or through
agents the breach of duty ought not be excused or justified on the
grounds of the laudable purpose or the public benefit of the
activity causing the injury. . . . Certainly institutions teaching
divine justice, the dignity of man and his obligations to his
fellowmen and to his Creator would not claim on the basis of their
teachings that they ought to be exempt from repairing the injury
done by themselves or their agents to another.

Id. at 254; see also Kojis v. Doctors Hosp., 107 N.W.2d 131, 133–34 (Wis. 1961)
(stating that charitable hospitals are no longer civilly immune because they are now
“larger in size, better endowed, and on more sound economic basis” and that
“insurance covering their liability is available and prudent management would dictate
that such protection be purchased”). However, following the elimination of common-law charitable immunity in Wisconsin, the Wisconsin Legislature did not enact laws,
similar to those enacted in Texas, insulating charities from liability for injuries arising
out of the performance of charitable services.


 
          With these policy considerations in mind, we note that the injury and the
conduct occurred in Wisconsin, where EAA is incorporated and maintains its only
offices. Also, although EAA maintains contacts with Texas sufficient to support a
finding of general jurisdiction, none of its Texas contacts were related to the aircraft
collision in this case. We thus conclude that Wisconsin has the dominant public
policy interest in determining whether EAA, a not-for-profit charitable organization
incorporated under the laws of Wisconsin, should be held immune from tort liability
for the collision that occurred in Wisconsin.


 Applying the protections afforded in
the Act to EAA for liability arising from the activities it conducted exclusively in
Wisconsin would be contrary to the policy of Wisconsin.


 Wisconsin has expressly
stated its policy that charities conducting activities which cause injuries should
generally not be immune from liability for those injuries. As for the relevant policies
of Texas, we note that although the Act is not expressly limited to organizations
incorporated in Texas, the express purpose of the Act is to encourage charitable
organizations to perform charitable services “within Texas.” Tex. Civ. Prac. &
Rem. Code Ann. § 84.002(1). Thus, the purposes sought to be achieved by the Act
would not be furthered by applying the Act to protect EAA, a Wisconsin-based
charitable organization, from liability arising out of a charitable event that it
conducted in Wisconsin. 
          We also note that EAA could have no justified expectation that it would be
entitled to the protections afforded under the Act for liability arising out of its
Wisconsin air show. The record indicates that volunteers from all over the country
participated in the EAA convention and air show, and any expectation by EAA that
it might be immune from liability for injuries sustained to participants, depending
upon the residence of the participants who were injured, would be unreasonable. Had
a Wisconsin resident, or a resident of another State without charitable immunity
protections similar to those available in Texas, been injured, EAA would not have any
claim to charitable immunity.  
          Finally, in regard to whether the application of Wisconsin law furthers the
interests of certainty, predictability, and uniformity of result, we note that these
interests are important when a party is likely to give advance thought to the legal
consequences of its actions. Restatement (Second) of Conflict of Laws § 145
cmt. i. Wisconsin does not provide charitable immunity, yet EAA elects to maintain
its only offices in Wisconsin and to conduct its annual convention and air show in
Wisconsin. Here, if we were to conclude that the domicile of the injured party or the
forum of the suit were the controlling factors in determining what law to apply on the
issue of charitable immunity, this conclusion would lead to unpredictable and non-uniform results. If we were to accept EAA’s argument, by the same logic, a non-resident of Texas, injured in Texas by acts or omissions of a charity, incorporated in
Texas and performing services in Texas, would undoubtedly pursue his claims against
the charity in a non-Texas forum and argue against application of the Act. Such a
result would be contrary to the clear purposes of the Act, which is to limit charities’
liability arising out of services performed in Texas, regardless of the forum of the suit
or the residence of the injured party. 
          In considering the “ease in the determination and application of the law to be
applied,” we recognize that Texas is the forum state and that the parties acquiesced
to the trial court’s application of Texas law to the liability issues. See Torrington Co.,
46 S.W.3d at 850. We also note that the Doctors and Pardue are residents of Texas. 
However, after considering the choice of law principles in section 6 and the factors
in section 145, we hold that Wisconsin is the State with the most significant
relationship to the issue of charitable immunity and that Texas does not have an
overriding interest in seeing the Act applied to this case.  
          In support of its argument for application of Texas law, EAA asserts that
(1) EAA has been held to be subject to the general jurisdiction of Texas courts,
(2) Wisconsin interests would be served by applying Texas law, and (3) the Act
applies to foreign charities doing business in Texas. First, our sister court’s finding
that “Texas has a greater, or at least equal, interest with that of all other states in
adjudicating this claim,” was made in the context of a general jurisdiction analysis,
which is completely distinct from the choice of law analysis undertaken by this Court. 
See Experimental Aircraft Ass’n, Inc., 76 S.W.3d at 509. The fact that EAA has been
held subject to general jurisdiction in Texas does not support EAA’s argument that
it should be entitled to the benefits and protections of the Act for liability arising out
of conduct unrelated to its Texas contacts. 
          Second, EAA’s argument that application of Texas law would serve the
“interest of Wisconsin by reducing the damages awarded against its resident
charitable organization” is without merit. Wisconsin has made a policy decision to
eliminate charitable immunity, and has specifically elected not to offer protections to
its charitable organizations similar to those available in Texas.


 Texas courts have
no authority to change Wisconsin public policy.  
          Third, the Act does not purport to encompass all charities incorporated in other
states that do some business in Texas. Instead, the Act plainly states that it is
intended to encourage the performance of charitable services within Texas. It does
not indicate that simply because a charity has been found to maintain continuous and
systematic contacts with Texas, it should be entitled to protections under Texas law
for conduct and injuries occurring outside of Texas. Although a charitable
organization that is incorporated in another state but performs services in Texas for
the benefit of Texas residents may have a legitimate claim to the protections afforded
under the Act, EAA is seeking protection from liability for conduct which occurred
outside of Texas and which was not specifically directed at Texas residents.


 
          Accordingly, we hold that the trial court erred in concluding that Texas was the
state with the most significant relationship to the issue of charitable immunity as to
EAA and in applying the Act to limit the liability of EAA. 
          We sustain appellants’ fifth issue.
Volunteer Immunity
          In their sixth issue, the Doctors argue that the trial court erred in applying the
Act to completely immunize Pardue because their injuries were caused by Pardue’s
negligent operation or use of an airplane. The Doctors further argue that because the
question of whether there has been a statutory waiver of immunity is a question for
the court, the trial court erred in submitting a question to the jury concerning the
application of the Act to Pardue. 
          Pardue argues that the Act immunizes him because his alleged negligence did
not involve the operation or use of an airplane and there was no nexus between his
alleged negligent operation or use of an airplane and the Doctors’ injuries. He
contends that the Doctors’ theory of liability was confined to their allegations that 
Pardue’s negligence during his pre-flight briefing caused the collision and asserts that
the Doctors “unwaveringly focused not on Pardue’s operation or use of an airplane
but upon Pardue’s inadequate briefing and poor communication.” He also asserts that
the Doctors’ evidence in support of their theory supports a deemed finding by the jury
that the Doctors’ injuries were not proximately caused by Pardue’s negligent
operation or use of an airplane.  
          The Act provides in relevant part:
          (b)     Except as provided by Subsection (c) of this section . . . a
volunteer who is serving as a direct service volunteer of a
charitable organization is immune from civil liability for
any act or omission resulting in death, damage or injury if
the volunteer was acting in good faith and in the course and
scope of his duties or functions within the organization.
 
          (c)     A volunteer of a charitable organization is liable to a
person for death, damage, or injury to the person or his
property proximately caused by any act or omission arising
from the operation or use of any motor-driven equipment,
including an airplane, to the extent insurance coverage is
required . . . and to the extent of any existing insurance
coverage applicable to the act or omission. 
 
Act of June 1, 1987, 70th Leg., ch. 370, § 1, 1987 Tex. Gen. Laws 1808 (amended
2003) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 84.004 (Vernon 
2005) (emphasis added)). 
          The charge contained a question that asked the jury whether Pardue “was
acting in good faith and in the course and scope of his duties and functions” as a
volunteer in a charitable organization at the time of the occurrence in question. The
charge did not contain any question as to whether the Doctors’ injuries were
proximately caused by an act or omission arising from the operation or use of an
airplane, and neither party requested a submission on this issue. Instead, the charge
simply asked the jury whether the negligence of Pardue caused the occurrence in
question. 
          During the charge conference, the Doctors objected to the submission of the
question regarding Pardue’s volunteer status as “not relevant since [all parties] agreed
that Mr. Pardue is limited to the $175 million in coverage.” It appears from the
record that, by making this objection, the Doctors conceded that, if the Act properly
applied, Pardue was a volunteer and he was entitled to the protections afforded under
subsection (c) of section 84.004, and thus could be held liable only to the extent of
any existing insurance coverage applicable to Pardue’s alleged acts or omissions. 
The court overruled the Doctors’ objection, and submitted a question about Pardue’s
volunteer status.
          The jury found that Pardue was acting in good faith and in the course and scope
of his duties and functions as a volunteer in a charitable organization at the time of
the collision, and the trial court, based on this finding, rendered final judgment that
the Doctors take nothing from Pardue. There is nothing in the record to indicate why
the trial court applied section 84.004(b), immunizing Pardue from liability, instead
of applying subsection (c), and limiting Pardue’s liability “to the extent of any
existing insurance coverage applicable.” 
          The Doctors did not specifically raise this issue in their motion for new trial or
in their motion to modify, correct, or reform the judgment. Instead, the Doctors
contended that the evidence was factually insufficient to support the jury’s finding
that Pardue was acting as a volunteer in a charitable organization at the time of the
collision and, alternatively, that the jury finding on this issue was immaterial since
Wisconsin law, which should have been applied pursuant to the most significant
relationship test, did not provide immunity for Pardue.


 However, in their motion
to disregard jury findings and for judgment notwithstanding the verdict, filed after the
trial court entered a take-nothing judgment in favor of Pardue, the Doctors argued that
the jury’s finding that Pardue was acting as a volunteer should be disregarded because
the evidence established, as a matter of law, that the Doctors’ injuries were caused by
Pardue’s acts or omissions arising from the operation or use of an airplane. 
          Here, the record reveals that the Doctors alleged, and presented evidence at
trial, that Pardue, in his role as a flight leader and participant in the air show,
negligently caused the collision. While EAA and Pardue vigorously disputed liability
at trial, the jury apportioned 25% liability to EAA and 25% liability to Pardue, and
neither defendant challenges the legal or factual sufficiency of the evidence
supporting those negligence findings. The Doctors did assert and did offer testimony
concerning the adequacy of the pre-flight briefing provided by Pardue and Pardue’s
execution of the flight plan and his communication to the other pilots, before and
during the run up and during the flight in question. However, Pardue’s argument that
there was no nexus between his alleged negligent operation or use of an airplane and
the Doctors’ injuries necessarily fails. The jury found that the negligence of Pardue
caused the occurrence in question. Any such negligence in regard to Pardue’s pre-flight briefing, execution of the flight plan, and/or communication with other pilots
directly concerned his operation and use of his aircraft. More importantly, both Lad
and Pardue were piloting their planes at the time of the collision. The bottom line is
that the evidence conclusively shows that Lad was injured when, in the course of
performing in the air show, his aircraft collided on the runway with an aircraft piloted
by Pardue. Thus, the evidence establishes, as a matter of law, that the Doctors’
injuries were proximately caused by an act or omission “arising from the operation
or use of . . . an airplane.”


 Tex. Civ. Prac. & Rem. Code Ann. § 84.004(c). 
Accordingly, we hold that the trial court erred in not applying section 84.004(c) of
the Act, limiting the liability of Pardue to the extent that he possessed any applicable
insurance coverage. 
          Alternatively, Pardue argues that the Doctors waived any error based on their
contention that their injuries were proximately caused by Pardue’s negligent
operation or use of an airplane because they failed to request a jury question on this
issue, object to this omission from the charge, obtain written findings necessary to
support a judgment of liability, and object to the trial court’s take-nothing judgment
on the grounds of legally or factually insufficient evidence. The Doctors, however,
argued in a post-judgment motion that the evidence established, as a matter of law,
that their injuries were caused by Pardue’s acts or omissions arising from the
operation or use of an airplane. Pardue emphasizes that this argument was made in
the Doctors’ “motion to disregard jury findings and for judgment nov” rather than in
their motion for new trial or in their motion to modify, correct, or reform judgment.
          The effect of a motion depends on the nature of the instrument, and we look to
an instrument’s substance rather than its form. Finley v. J.C. Pace Ltd., 4 S.W.3d
319, 320 (Tex. App.—Houston [1st Dist.] 1999, no pet.). The substance of a motion
is not determined solely from its caption or introduction, but instead is gleaned from
the body of the motion and the prayer for relief. Id. Furthermore, the supreme court
has stated that “a timely filed post-judgment motion that seeks a substantive change
in an existing judgment qualifies as a motion to modify under Rule 329b(g).” Lane
Bank Equip. Co. v. Smith S. Equip. Co., 10 S.W.3d 308, 314 (Tex. 2000); see also
Tex. R. Civ. P. 329b(g); Ramirez v. Williams Bros. Constr. Co., 870 S.W.2d 551, 552
(Tex. App.—Houston [1st Dist.] 1993, no writ); Brazos Elec. Power Coop., Inc. v.
Callejo, 734 S.W.2d 126, 129 (Tex. App.—Dallas 1987, no writ). 
          Here, after the entry of the final judgment, which provided absolute immunity
to Pardue, the Doctors contemporaneously filed multiple post-judgment motions,
including a motion for new trial, a motion to modify, correct, or reform the judgment,
and a motion to disregard jury findings and for judgment notwithstanding the verdict.
In their argument that the evidence established, as a matter of law, that the Doctors’
injuries were caused by Pardue’s acts or omissions arising from the operation or use
of an airplane, it is readily apparent that the Doctors were seeking a substantive
change in the judgment. We thus conclude that appellants preserved this issue for our
review.
          Having held that the trial court erred in not applying section 84.004(c) of the
Act and limiting the liability of Pardue to the extent that he possessed any applicable
insurance coverage, we further hold that the trial court erred in rendering a take-nothing judgment in favor of Pardue. 
          We sustain appellants’ sixth issue. 
Damages
          In their first issue, the Doctors argue that, because it is undisputed that Lad
suffered catastrophic injuries that rendered him a quadriplegic, the jury’s zero damage
findings for intangible damages, including past and future physical impairment, past
and future mental anguish, and past and future disfigurement, are against the great
weight and preponderance of the evidence. In their second issue, the Doctors argue
that the jury’s zero damage finding for past medical expenses is against the great
weight and preponderance of the evidence because there was uncontroverted evidence
of approximately $400,000 in past medical expenses. In their third issue, the Doctors
argue that the jury’s award of $2.5 million in damages for future medical expenses
is against the great weight and preponderance of the evidence because EAA’s and the
Doctors’ expert testimony established a range of $5.3 million to $8.1 million for
future medical expenses. In their fourth issue, the Doctors argue that because there
is uncontroverted evidence of Linda’s loss of consortium as a result of Lad’s injuries,
the jury’s finding of zero damages for Linda’s past loss of consortium and $50,000
in damages for Linda’s future loss of consortium are against the great weight and
preponderance of the evidence. 
          EAA and Pardue do not respond to the Doctors’ first four issues.



Standard of Review
          To sustain a challenge to the factual sufficiency of a jury’s failure to award
damages or its award of inadequate damages, we consider and weigh all the evidence,
both supporting and against the findings, in order to decide whether the verdict
should be set aside. Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986);
Prescott v. Kroger Co., 877 S.W.2d 373, 374 (Tex. App.—Houston [1st Dist.] 1994,
writ denied). We will uphold the jury’s verdict unless it is so against the great weight
and preponderance of the evidence as to be manifestly unjust or shocking to the
conscience. Pool, 715 S.W.2d at 635; Prescott, 877 S.W.2d at 374. We may not
merely substitute our judgment for that of the jury. Pool, 715 S.W.2d at 635. We
note that the jury is the sole judge of the credibility of witnesses and the weight to be
given to their testimony. Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757,
761 (Tex. 2003). When, as in this case, the jury’s failure to find greater damages in
more than one overlapping category is challenged, we must first determine if the
evidence unique to each category is factually sufficient. Id. at 775.


 If it is not, we
must then consider all the overlapping evidence, together with the evidence unique
to each category, to determine if the total amount awarded in the overlapping
categories is factually sufficient. Id.



The Court’s Charge
          The charge asked the jury what sum of money would fairly and reasonably
compensate Lad for his injuries resulting from the collision. It required the jury to
answer separately for the following elements of damages: (1) physical pain and
mental anguish sustained in the past; (2) physical pain and mental anguish that, in
reasonable probability, will be sustained in the future; (3) disfigurement sustained in
the past; (4) disfigurement that, in reasonable probability, will be sustained in the
future; (5) physical impairment sustained in the past; (6) physical impairment that, in
reasonable probability, will be sustained in the future; (7) reasonable expenses of
necessary medical care in the past; and (8) reasonable expenses of necessary medical
care that, in reasonable probability, will be sustained in the future. The charge also
asked the jury what sum of money would fairly and reasonably compensate Linda for
her past and future loss of consortium. It instructed the jury to “consider the elements
of damages listed and none other,” to “consider each element separately,” and to “not
include damages for one element in any other element.”


 
          In regard to Lad, the jury awarded $2.5 million in damages for future medical
expenses and zero damages for past and future physical pain and mental anguish, past
and future disfigurement, past and future physical impairment, and past medical
expenses. In regard to Linda, the jury awarded zero damages for past loss of
consortium and $50,000 for future loss of consortium. 
The Evidence
          In our determination of whether the verdict should be set aside, we now
consider and weigh all the evidence, both supporting and against these findings. 
          Past and future physical impairment, physical pain and mental anguish, and           disfigurement

          In order to recover damages for physical impairment, “the effect of any
physical impairment must be substantial and extend beyond any pain, suffering,
mental anguish, lost wages or diminished earning capacity.” Golden Eagle Archery,
Inc., 116 S.W.3d at 772. Moreover, the “loss of enjoyment of life” may be considered
as a factor in assessing damages for physical impairment. Id. In order to recover
mental anguish damages, a plaintiff must establish “a high degree of mental pain and
distress” that is “more than mere worry, anxiety, vexation, embarrassment, or anger.” 
Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995). Disfigurement has been
defined as that which impairs the appearance of a person, or that which renders
unsightly, misshapen or imperfect, or deforms in some manner. Goldman v. Torres,
341 S.W.2d 154, 160 (Tex. 1960); Sunbridge Healthcare Corp. v. Penny, 160 S.W.3d
230, 252 (Tex. App.—Texarkana 2005, no pet.).       
          Here, the undisputed evidence establishes that Lad suffered a spinal cord injury
in the collision and was rendered a quadriplegic. Lad has a “high level quadriplegia”
and is no longer able to walk or move his legs, arms, or hands. He suffers from
substantial swelling as a result of his inability to move his limbs. He has feeling only
in his face and is able to power his wheelchair only by using his head and mouth. Lad
has significant respiratory problems, his breathing muscles are impaired, and he
requires daily breathing treatments and nighttime ventilation. At the time of trial, he
required ventilator treatments three to four times daily and Lad’s physician testified
that, if his condition persisted, he would always require ventilation. As a result of the
collision, Lad’s diaphragm is abnormal. He fatigues when he talks for extended
periods of time, and as he talks, carbon dioxide builds up in his lungs, which causes
him to suffer from confusion and disorientation.     
          Lad is not able to care for himself. He has no bladder or bowel control and
must undergo bowel treatments daily. He can be transferred from his bed to his
wheelchair only with the assistance of at least two other people. He must use special
seats, mattresses, and other equipment. He must be repositioned every thirty minutes
to prevent skin problems, and must have his skin brushed every day. As Lad ages,
his risk of skin breakdown will increase and his immune system will continue to
decline. He also has spasms and tremors when he is touched.  
          Lad has suffered numerous medical complications related to his spinal cord
injury that have made his condition very fragile. His condition has caused profound
osteoporosis, and he cannot control his body temperature, which may quickly reach
as high as 105 degrees or as low as 94 degrees. He suffers from life-threatening
blood-pressure problems. Lad does not sleep well; he wakes up every two to three
hours, and sometimes only sleeps two to three hours a night. 
          Moreover, Lad’s condition has worsened since the collision, and the level at
which he has no feeling has risen. At the time of trial, surgery was planned in hopes
of improving his condition. However, it is undisputed that Lad will always be a
quadriplegic and will always be incapable of caring for himself.
          Lad testified, in explicit detail, concerning the physical pain and mental
suffering that he has experienced. He described the indignity he feels as a result of
his condition and his constant need for assistance in performing the most basic of
human functions. Lad related his feelings of depression when he discovered that,
despite every effort at rehabilitation, he would never walk again and would always
need a ventilator to breathe. Lad also noted that during one particular treatment,
when a tube was inserted into his throat, he gagged, his jaw cracked, and he
experienced severe discomfort. Lad explained that suctioning performed on him
during treatment is very uncomfortable and that breathing through a ventilator is also
very uncomfortable. When his blood pressure is elevated, Lad experiences headaches
and painful tightening of his neck.
          Linda testified that Lad has never been able to cope with his paralysis and that
he is extremely depressed. Lad has described himself to Linda “as a head on top of
a body.” Lad’s general attitude has significantly changed for the worse, he frequently
becomes angry, and he has stated that he would like to die. Lad has undergone
counseling to attempt to cope with his injuries, but Lad and his family are frightened
by his condition, and Lad lives in fear. Specifically, Lad is fearful that his ventilator
may stop working or that he will be dropped when being transferred or moved. Lad
is also fearful that he may be injured by someone attempting to assist him. 
          The Doctors also presented extensive evidence concerning Lad’s
hospitalization, and the pain and suffering that he has experienced during those
hospitalizations. Immediately after the collision, Lad was taken to a local medical
center and then transferred to a spinal cord injury unit at another hospital, where he
stayed for one week. While there, he was placed on a ventilator and fed through a
stomach tube. Linda testified that Lad was terrified. Lad was then transferred to
another hospital for continued spinal cord care, and remained at that hospital for
another month. There, Lad underwent decompression surgery to stabilize his neck,
during which pins were inserted into his neck to hold it in place. These metal pins
cause Lad pain. While at this medical center, Lad could not communicate with
anyone, make any sound, or press a call button to summon the assistance of the
nurses. Lad could not move his head, but he did experience discomfort in his head,
and was medicated for that discomfort. Lad also was strapped to a board to
completely immobilize him.
          Lad was then transferred to another care facility for rehabilitation, where he
remained for another two months. There, Lad suffered from numerous medical
conditions and complications, including pneumonia, respiratory problems, infections,
hypertension, and anemia.                   
          Past medical expenses
          To recover past medical expenses, a claimant must prove that the expenses
were reasonable and necessary. Nat’l Union Fire Ins. Co. v. Wyar, 821 S.W.2d 291,
297 (Tex. App.—Houston [1st Dist.] 1991, no writ). A plaintiff may prove medical
expenses are reasonable and necessary by submitting affidavits in compliance with
section 18.001 of the Texas Civil Practice and Remedies Code. Tex. Civ. Prac. &
Rem. Code Ann. § 18.001 (Vernon Supp. 2004-2005); see also Jackson v. Gutierrez,
77 S.W.3d 898, 902 (Tex. App.—Houston [14th Dist.] 2002, no pet.). In this case,
the Doctors presented medical billing records supported by affidavits, which
established reasonable and necessary medical expenses of over $400,000. EAA even
essentially conceded during closing argument that the Doctors had proven past
medical expenses in this amount. 
          Future medical expenses
          Texas follows the “reasonable probability rule” for future damages for personal
injuries. Rosenboom Mach. & Tool, Inc. v. Machala, 995 S.W.2d 817, 828 (Tex.
App.—Houston [1st Dist.] 1999, pet. denied). Thus, to recover future medical
expenses, a plaintiff must show that there is a reasonable probability that expenses
resulting from the injury will be necessary in the future and the reasonable costs of
such care. Id. 
          Here, the Doctors’ expert testified in support of an award of $8,134,659.08 in
future medical expenses. EAA’s expert testified to $5,320,027 in future medical
expenses. In closing argument, EAA argued that an award of five million dollars for
future medical expenses would be “more than reasonable.” Yet the jury awarded only
$2.5 million for future medical expenses, less than half the amount recommended by
EAA’s own expert. 
          Loss of consortium
          Linda testified that before the accident, Lad was a warm and caring husband,
but since the accident he does not like for Linda to kiss him and that she can no
longer talk to him because he has so much with which to cope. Linda explained that
she no longer has her husband to console her and that she wakes up each morning
with the same realization that Lad is paralyzed. 
The jury’s findings         
          In regard to their first issue, the Doctors presented overwhelming and
uncontroverted evidence establishing that, as a result of the collision, Lad was
rendered a quadriplegic and that Lad sustained, and in reasonable probability would
sustain in the future, severe physical pain and mental anguish. The evidence also
establishes that Lad is disfigured and physically impaired as a result of the collision.
It was uncontroverted that Lad would remain disfigured and physically impaired for
the remainder of his life. Furthermore, the record reveals that appellees made
virtually no attempt to controvert the Doctors’ evidence concerning these elements
of damages. Yet the jury awarded zero damages in each of these categories. EAA
and Pardue present us with no record citations to evidence that in any way supports
the jury’s zero damage findings for Lad’s non-economic damages, and we have found
no such evidence. 
          Accordingly, we hold that the jury’s zero damage findings on Lad’s past and
future physical pain and mental anguish, past and future physical impairment, and
past and future disfigurement are so against the great weight and preponderance of
the evidence as to be manifestly unjust and shocking to the conscience. Moreover, 
in regard to Golden Eagle Archery, Inc., we note that because the jury awarded zero
damages for every category of potentially overlapping non-economic damages
claimed by Lad, there is no possibility that the jury elected to compensate Lad for his
physical pain or mental anguish in any other category of non-economic damages. See
116 S.W.3d at 773–75. 
          We sustain the Doctors’ first issue. Having held that the evidence is factually
insufficient to support the jury’s zero damage findings for Lad’s past and future
physical pain and mental anguish, past and future physical impairment, and past and
future disfigurement, we need not address the Doctors’ second, third, and fourth
issues concerning the jury’s damage findings for Lad’s past and future medical
expenses and Linda’s loss of consortium. See Hicks v. Ricardo, 834 S.W.2d 587, 590
(Tex. App.—Houston [1st Dist.] 1992, no writ) (indicating that case should be
reversed and remanded for new trial if court finds that one of jury’s damage findings
is against great weight and preponderance of evidence).
Conclusion
          We reverse and remand this case for a new trial.  
          
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Jennings, Hanks, and Evans.